UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK
_____

CATHERINE LEISTEN,

                              Plaintiff

                                                              DECISION AND ORDER

-vs-
                                                              08-CV-6556 CJS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                              Defendant.
_____

APPEARANCES

For the Plaintiff:          Jere  B. Fletcher, Esq.
                            P.O. Box 10632
                            Rochester, New York 14610

For the Defendant:          John J. Field, Esq.
                            Assistant United States Attorney
                            100 State Street
                            Rochester, New York 14614

INTRODUCTION

    This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied plaintiff Catherine Leisten's  ("Plaintiff") application for supplemental

security income benefits.  Now before the Court is Defendant's motion [#11] for

judgment on the pleadings and Plaintiff's cross-motion [#12] for judgment on the

pleadings.  For the reasons that follow, Plaintiff's application is granted, Defendant's

application is denied, and this action is remanded to the Commissioner of Social

Security for further administrative proceedings.

1

# PROCEDURAL HISTORY

Plaintiff applied for supplemental security income benefits, with a protective filing date of June 22, 2005.  Plaintiff claimed to be disabled due to bipolar disorder, depression, anxiety, post-traumatic stress disorder ("PTSD"), and lower-back pain. (77, 92).[1]  On November 17, 2005, the Commissioner denied the application. (53-55).  On May 21, 2008, a hearing was held before Administrative Law Judge Newton Greenberg ("ALJ").  On June 19, 2008, the ALJ issued a decision denying benefits. (15-26).[2]  Plaintiff appealed to the Appeals Council, and submitted additional medical records, including new records reflecting medical treatment, occurring after the May 21st hearing, by Gregory Seeger, M.D. ("Seeger"), which will be discussed further below.  On November 26, 2008, the Appeals Council denied Plaintiff's request for review. (4-8).  The Appeals Council indicated that it considered Seeger's notes, but did not comment further on them. (5).  Consequently, the Appeals Council's decision, dated November 26, 2008, is the Commissioner's final decision. *See, Pollard v. Halter*, 377 F.3d 183, 191 (2d Cir. 2004) ("Like the Seventh and Eighth circuits, we find that a 'final decision' by the SSA is rendered when the Appeals Council either considers the application on the merits or declines a claimant's request for review, and not simply when the ALJ issues its decision.") (citation omitted).  On December 8, 2008, Plaintiff commenced the

---

[1] Unless otherwise noted, citations are to the Administrative Record.

[2] For SSI applications, the relevant period is between the date of the application and the date of the ALJ's decision. *See, e.g., Grey v. Barnhart*, 123 Fed.Appx. 778, 779-780, 2005 WL 352532 at *1 (9th Cir. Feb. 14, 2005) ("The parties agree that to establish eligibility for SSI disability benefits, Grey had to prove that he suffered from a severe impairment during the relevant period-between October 6, 1999, when he filed his application for benefits, and October 26, 2001, the date of the ALJ's decision."). Consequently, in the instant case, the issue is whether Plaintiff was disabled during the period June 22, 2005 through June 19, 2008.

subject action.

Subsequently, the parties filed their cross-motions for judgment on the pleadings. Defendant maintains that the ALJ's decision reflects the proper application of the relevant law and is supported by substantial evidence. Plaintiff, however, maintains that the ALJ's decision is flawed in the following respects: 1) the ALJ ignored or selectively evaluated evidence; 2) the ALJ did not properly apply the treating physician rule; 3) the ALJ failed to recognize that Plaintiff's substance abuse is related to her bipolar condition; 4) Plaintiff had listed impairments; and 5) Plaintiff was denied due process at the hearing.

VOCATIONAL HISTORY

Plaintiff was thirty-three years of age at the time of the hearing, and had completed the eleventh grade. (365-366). Plaintiff has failed her GED exam, but is interested in taking it again. (127). Her employment history includes brief stints as a supermarket cashier, food service worker in a restaurant and movie theater, and a housekeeper in a hotel. (78). It appears that Plaintiff has held only four jobs in her lifetime, with such work limited to portions of the years 1992, 1993, 1998, 1999, and 2000. (78). During those years, Plaintiff's annual earnings never exceeded $1,990. (78, 95). Plaintiff has never worked at any job longer than three or four months. (180, 373). Plaintiff has not worked since August 2001, and she states that she became unable to work in December 2004. (*Id.*).

ACTIVITIES OF DAILY LIVING

In her application for SSI benefits, Plaintiff stated that she spent her days going to group therapy and mental health therapy, walking, shopping, and visiting her six

children, who are either in foster care or living with relatives. (85, 109A). Plaintiff is able to care for herself and prepare her own meals. (86). Plaintiff is also able to perform all household chores including laundry, dishes, vacuuming, and dusting. (87). While Plaintiff is capable of driving, her license is suspended. (*Id.*). Plaintiff has hobbies, including watching movies and playing bingo. (88). Plaintiff socializes with others, but at times she feels unable to do so because of her mood. (89). Plaintiff claims to experience pain in her back from standing too long or walking long distances. (93). Plaintiff states that her "mental health" problems cause her to have good days and bad days, and that it is difficult for to focus. (102). At the hearing before the ALJ, Plaintiff explained why she cannot work:

> Sometimes I get overwhelmed. I get frustrated. I get, you know, I think I'm doing very well and then I sabotage myself because maybe I feel good one day then I don't feel good the next. I want to stay in bed so I'll stay in bed. My moods go up and down, but I'm trying to control that with the medication. . . . I don't know why, but then my moods I'll just lay on the couch some days. I feel like blah. I just don't feel right.

(367). Plaintiff stated that she was interested in supporting herself, but that her "mental" got in the way of "feeling successful or wanting to complete something." (369). Plaintiff stated that any physical problems she had did not prevent her from working. (368).

MEDICAL EVIDENCE

Plaintiff's medical history was summarized in the parties' submissions and need not be repeated here in its entirety. It is sufficient for purposes of this Decision and Order to note the following facts.

On October 28, 1998, Plaintiff completed a Chemical Dependency Program at

4

the Family Service of Rochester, for alcohol and cocaine dependency. (106, 108). The discharge summary stated that Plaintiff had completed her treatment goals and had consistently passed urinalysis testing. (106). The discharge summary recommended that Plaintiff continue mental health counseling and attend Twelve-step support group meetings. In July 2004 Plaintiff gave birth to a son. (161-167). Plaintiff reported having used cocaine three months earlier. (161). On July 6, 2004, Plaintiff entered a mental health program through the "Strong Recovery" program at Strong Memorial Hospital. (169-170). The intake diagnosis was cocaine dependence, opiate dependence, panic disorder, depression, and "hx [history of] bipolar disorder." (169). Plaintiff attended several sessions with a therapist, but then stopped coming and was terminated from the program. (170). The discharge prognosis was, "poor if she does not receive treatment." (*Id*.).

In June 2005, Plaintiff entered the Addiction Psychiatry Program at Strong Memorial Hospital, through which she was to receive education and psychotherapy each week. (171). Drug testing performed in July 2005 was negative. (175-177).

On September 28, 2005, Plaintiff was examined by Melvin Zax, Ph.D. ("Zax"), a non-treating consultative examiner. (180-183). Plaintiff told Zax that she had six children, two of whom lived with her, while the other four lived with relatives. (180). Plaintiff stated that her longest period of continuous employment was two months. (*Id*.). Plaintiff reported that she was never hospitalized for psychiatric reasons, but had been seeking outpatient treatment since 2003. (*Id*.). Plaintiff stated that she was currently attending group and individual counseling sessions each week. (*Id*.). Plaintiff reported

being bipolar, anxious, and depressed, and said that she felt moody, low, sleepy, and overwhelmed. (181). Plaintiff stated that she began drinking alcohol at age 16 and using cocaine, heroin, and marijuana at age 18. Plaintiff indicated that she used drugs (cocaine and heroin) daily until 2004. (181). Plaintiff reported having been in "many different rehab programs." (181). Plaintiff further reported having been arrested twice for prostitution and drug possession. (181). Additionally, Plaintiff reported feeling close to her family, and that she socialized with friends. (182). Plaintiff stated that she was able to care for herself and her children, as well as cook, clean, shop, do laundry, and keep appointments. (182). Upon examination, Zax found that Plaintiff's thinking was coherent and her affect was appropriate. (182). Plaintiff's attention, concentration, and memory were intact, her insight and judgment were fair, and her intelligence was borderline. (182). Zax stated that Plaintiff could follow and understand simple directions. (182). Zax's diagnosis was "depressive disorder, mild." Zax opined that Plaintiff could handle her own funds "as long as she remains free of alcohol and drug use." (183). Zax concluded,

> I think if the claimant feels the need for it, she should continue in her treatment and on medication. I think some encouragement should be given to her to begin thinking about supporting herself. She seems to have little or no interest in that and, for that reason, I think her prognosis is quite poor.

(183).

On September 29, 2005, Plaintiff was examined by Harbinder Toor, M.D. ("Toor"), another non-treating consultative examiner. (184-187). Plaintiff reported having back pain, due to an injury from lifting at work. (184). Plaintiff stated that the pain was "off and on pain," that was worsened by walking, sitting, standing, lifting, and

bending. (*Id*.).  Plaintiff stated that she took over-the-counter pain medication as needed.  Plaintiff also reported having shortness of breath, and some chest pain related to the surgical removal of her thymus gland years earlier. (*Id*.).  Plaintiff was taking various medications, including Abilify, Seroquel, Topamax, Lamictal, Zoloft, and Omeprazole.   Plaintiff stated that, prior to age 30 she was a "heavy" user of marijuana, cocaine, and heroin. (185).  Plaintiff indicated that she was able to shower and bathe herself, cook, clean, do laundry, shop, socialize, go for walks, go to movies, and read. (*Id*.).  Upon examination, Plaintiff was found to be obese, being 5' 5" tall and weighing 271 pounds.  Plaintiff was in no acute distress, with normal gait, able to walk on heels and toes without difficulty, with a normal stance, and needed no help rising from her chair or getting on and off the examining table. (*Id*.).  Plaintiff's spine was essentially normal, except for some "mild pain" in the lumbar spine with rotary movements. (186).  An x-ray of the lumbosacral spine showed "moderate narrowing of the disk space at the L5-S1 level," with "mild scoliosis." (187, 188).  Straight-leg raising was "slightly positive." (*Id*.).  Plaintiff had full strength in her limbs and hands. (*Id*.).  Toor concluded that Plaintiff had "mild limitation for walking for a long distance, sitting for a long time, standing for a long time, lifting, and bending." (187).

On October 27, 2005, K. Kriner, ("Kriner"), a non-treating, non-examining agency review physician, indicated that Plaintiff had "[n]o specific functional limitations." (192).

On November 16, 2005, Cheryl Butensky, Ph.D. ("Butensky"), a non-treating, non-examining agency review psychologist, completed a Psychiatric Review Technique form. (195-208).  Butensky stated that Plaintiff had affective disorders and substance

addiction disorders that were not severe. (195).  Butensky indicated that Plaintiff would have only mild limitations with regard to restrictions of activities of daily living, maintaining social functioning, and maintaining concentration, persistence and pace. (205).

On November 30, 2004, treating physician Gloria Baciewicz, M.D. ("Baciewicz") completed an "initial assessment" form for the Strong Recovery program. (211-216). Plaintiff's chief complaint was that she needed help to "stay focused each day and to help her talk about her feelings." (211).  Plaintiff stated that she had attempted similar treatment five separate times since 2002.  Plaintiff indicated that she was attending AA meetings daily.  Plaintiff stated that she had six children, two of whom were in foster care, and four of whom were living with relatives.  Plaintiff also stated that her mother and maternal grandfather were alcoholics, and that alcoholism, bipolar disorder, and depression were prevalent on the maternal side of her family.  Plaintiff further revealed that she was sexually abused as a child, and that one of her boyfriends had been physically abusive.  Plaintiff described a long history of using alcohol and crack cocaine, with some limited use of heroin. (212).  Plaintiff stated that upon completing a treatment program in August 2004, she immediately began using cocaine, and continued to do so until she was arrested and jailed in November 2004 for prostitution and drug possession.  Plaintiff reported having mood swings, daily panic attacks, and "wacky dreams," and said that she had previously had auditory hallucinations. (213).  Plaintiff's mood was depressed, her judgment and insight were poor, and she showed some signs of memory deficits.  Baciewicz observed that Plaintiff was present in her office because of a referral by the Department of Social Services, and that Plaintiff appeared

"unenthusiastic" about the prospect of treatment.  Baciewicz's diagnosis was cocaine dependence with physiologic dependence, "bipolar disorder per Catherine," and possible panic disorder and depressive disorder.  Baciewicz recommended that Plaintiff enter an intensive outpatient treatment program.

On November 30, 2005, Baciewicz stated that she had been Plaintiff's psychiatrist "for many years[3] in conjunction with [Plaintiff's] treatment at Strong Recovery," and that Plaintiff had bipolar disorder, panic disorder, and cocaine dependence. (210).  As with her previous report from 2004, in referring to Plaintiff's bipolar disorder, Baciewicz desribed it as, "Bipolar disorder, per Catherine." (213). Baciewicz stated, "In my opinion she remains unable to work at this time because of her mood and anxiety problems." (210).

Between November 2004 and December 2005, Plaintiff had weekly drug screening tests that were negative. (232-267).

On December 27, 2007, Plaintiff was discharged from a Strong Recovery chemical dependency outpatient program.  (331-334).  The discharge summary stated that Plaintiff's cocaine dependence and alcohol dependence were in "early full remission," and that her Global Assessment Functioning Scale score was 70. (331). The report stated that Plaintiff had attended 55 group sessions and 33 individual sessions, had "remained abstinent throughout the course of treatment," and had "responded well to medications." (331).  The discharge summary stated that further mental health services were recommended, including group therapy and

_____

[3]Baciewicz's reference to treating Plaintiff for "many years" appears questionable, since she had completed an "initial assessment" form just one year earlier.

psychopharmacology.  Plaintiff's prescriptions for Abilify, Buspar, Topamax, and Wellbutrin, were continued. (333).

On May 30, 2008, Plaintiff visited the Genesee Mental Health Center, purportedly at the suggestion of her new primary care physician, Dr. Dlugozima, for treatment of bipolar disorder. (349).  Although there is not necessarily any significance to this fact, the timing of this visit was one week after Plaintiff's hearing before the ALJ in this case.  Moreover, during her intake interview, Plaintiff stated that she was concerned about her SSI application: "Client is also concerned with her SSI and states she has a lawyer helping her to get benefits." (349).  Plaintiff was interviewed by Anita McLeod, LMSW ("McLeod").  Plaintiff stated that she had "real highs" and "real lows" in her mood, and described her activities during her alleged manic and depressive phases.  Plaintiff reported that she had "tried several different medications for her bipolar," and that some of the medications, specifically lithium and Seroquel, "made her feel very high or drunk." (349).  Plaintiff stated that she had been clean and sober for thirteen months. (350).  Plaintiff reported having crying spells "at the drop of a dime." (*Id*.).  Plaintiff denied having any physical pain.  Plaintiff was on time for her appointment and appeared well groomed and cooperative.  Plaintiff's thought processes appeared organized, but she stated that her thoughts are continually racing.  Plaintiff stated that she did not feel depressed or anxious, her thoughts were goal oriented, and her mood was full. (351).  Plaintiff's judgment and concentration were fair,

her insight was poor, and her impulse control was good. McLeod's[4] diagnosis was "296.80 bipolar disorder unspecified,"[5] cocaine dependence in sustained full remission, rule out borderline personality disorder. (*Id.*).

On July 1, 2008, Plaintiff met with Gregory L. Seeger, M.D. ("Seeger"), purportedly for "Medication Review." (353-354). Plaintiff reported that her appetite was stable, and that she slept well, but was "still having psychotic symptoms," apparently referring to hearing voices. (353).[6] Plaintiff stated that she had "some mild mood swings with anxiety at times." (*Id.*). Seeger observed that Plaintiff was alert, oriented, cooperative, with no paranoia or thought disorder, and will good judgment. (*Id.*). On September 5, 2008, Plaintiff saw Seeger for another Medication Review (355-356).

---

[4]As a clinical social worker, McLeod is not an "acceptable medical source" for purposes of establishing an impairment. 20 C.F.R. § 404.1513(a). However, her opinion may be considered to show the severity of an impairment and how it affects Plaintiff's ability to work. 20 C.F.R. § 404.1513(d)(1).

[5]The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR") describes 296.80 Bipolar Disorder Not Otherwise Specified, as follows:
The Bipolar Disorder Not Otherwise Specified category includes disorders with bipolar features that do not meet criteria for any specific Bipolar Disorder. Examples include

1. Very rapid alteration (over days) between manic symptoms and depressive symptoms that meet symptom threshold criteria but not minimal duration criteria for Manic, Hypomanic, or Major Depressive Episodes.

2. Recurrent Hypomanic Episodes without intercurrent depressive symptoms

3. A Manic or Mixed Episode superimposed on Delusional Disorder, residual Schizophrenia, or Psychotic Disorder Not Otherwise Specified

4. Hypomanic Episodes, along with chronic depressive symptoms, that are too infrequent to qualify for a diagnosis of Cyclothymic Disorder

5. Situations in which the clinician has concluded that a Bipolar Disorder is present but is unable to determine whether it is primary, due to a general medical condition, or substance induced[.] [sic]

DSM-IV-TR at 400-401 (2000).

[6]In November 2004, Plaintiff denied having hallucinations, but stated that she had auditory hallucinations in the past. (216).

Seeger noted, "Patient still has mood swings ups and downs. . . .  Patient still has some mild mood swings but in general her mood has been relatively stable." (355).  Plaintiff appeared to have a good affect, she was not depressed, and there were no signs of paranoia or thought disorder. (355).  However, Plaintiff claimed to hear voices "episodically." (*Id*.).  On October 12, 2008, Seeger completed a "Substance Abuse Supplemental Questionnaire," apparently at the request of Plaintiff's attorney. (359-360).  Seeger stated that Plaintiff's alcohol and drug addictions were in "sustained full remission." (359).  Seeger further diagnosed Plaintiff as having "296.80 Bi-Polar D.O. [disorder], unspecified," which was not drug induced. (*Id*.).  Seeger stated that Plaintiff's impairments would seriously interfere with her ability to perform in a competitive work setting on a sustained basis, and would limit her ability to attend work punctually and consistently, concentrate, get along with others, and follow directions. (360).  Seeger agreed that Plaintiff "has a pattern of inner experience and behavior that is enduring, inflexible, maladaptive in social settings such as the competitive workplace," that stress would negatively impact Plaintiff's behavior, and that she "may be able to function in some areas but still experience serious or marked impairment in other areas unrelated to substance abuse or dependency." (*Id*.).  Seeger further agreed that people with bipolar disorder may "self-medicate with alcohol or street drugs." (*Id*.).

STANDARDS OF LAW

_____42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the

Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted). At step five of the five-step analysis above, the Commissioner may carry his burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Stating that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.") However, if a claimant has nonexertional impairments which

"significantly limit the range of work permitted by his exertional limitations," then the Commissioner cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert ["(VE")](or other similar evidence) that jobs exist in the economy which claimant can obtain or perform."[7] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d).[8]

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2). However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)). Nevertheless,

> [a]n ALJ who refuses to accord controlling weight to the medical opinion of

---

[7]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[8]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

a treating physician must consider various 'factors' to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id*. The regulations also specify that the Commissioner 'will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion.' *Id*.; *accord* 20 C.F.R. § 416.927(d)(2); *see also Schaal*, 134 F.3d at 503-504 (stating that the Commissioner must provide a claimant with "good reasons" for the lack of weight attributed to a treating physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Administrative Law Judges are required to evaluate a claimant's credibility concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states in relevant part:

In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6) and 404.1513(b) (1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.

***

In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then

determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The regulation further states, in relevant part:

Factors relevant to your symptoms, such as pain, which we will consider include:
(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).

THE ALJ'S DECISION

At the first step of the five-step sequential analysis described above, the ALJ found that plaintiff had not engaged in substantial gainful employment since June 22, 2005, the protective filing date. At the second step of the analysis, the ALJ found that plaintiff had the following severe impairments: "History of cocaine dependence and polysubstance abuse; depressive disorder, mild; and bipolar disorder by history." (20). In that regard, the ALJ stated that Plaintiff had a "long history of alcohol and drug abuse," for which she had sought treatment several times. (20-21).  The ALJ added that Plaintiff had apparently been drug-free since April 2007. (21).  Referring to "what the

claimant has described as 'bipolar disorder,'" the ALJ observed that Plaintiff had

primarily sought mental health treatment as part of her substance abuse programs, and

that she had "no exclusively psychiatric hospitalizations." (21).  The ALJ further

reviewed Baciewicz's findings, noting that she had diagnosed Plaintiff as being bipolar,

"per the claimant." (21).  The ALJ also reviewed Zax's findings, noting that he had

diagnosed Plaintiff as having a mild depressive disorder.  As for Plaintiff's physical

complaints, the ALJ found that they were not severe, and caused only "generally mild

limitations." (21).  The ALJ further acknowledged that Plaintiff was not claiming to be

disabled due to any physical impairment.  At step three of the five-step analysis, the

ALJ found that Plaintiff did not have a listed impairment. (21).  At step four of the five-

step analysis, the ALJ found that Plaintiff did not have any past relevant work, but that

she had the residual functional capacity "to perform work at all exertional levels but with

the following non-exertional limitations: Mild limitation in performing basic mental work-

related activities." (22).  In explaining his RFC determination, the ALJ reviewed the

medical evidence and explained how he analyzed the opinion evidence. (22-25).

Concerning bipolar disorder, the ALJ wrote:

> Regarding the possible diagnosis of a bipolar disorder: [T]he record
> shows at best 'a history of bipolar disorder' and more frequent diagnoses
> are: rule out depression NOS or rule out panic disorder.  The claimant
> states Lithium made her hands shake, but no medication list by treating or
> non-treating sources includes Lithium among the claimant's medications.
> In addition, although she describe[d] herself as feeling moody or low or
> overwhelmed, the claimant states, she does not isolate herself, she
> participates at times in social activities with family, depending how she
> feels and she can get along with those in authority.

(23).  The ALJ acknowledged that, according to Baciewicz, Plaintiff was "unable to work

at this time because of her mood and anxiety problems." (*Id*.).  The ALJ noted that

Baciewicz was a treating physician and a specialist, and that she had "a substantial treating relationship with the claimant." (24). Nevertheless, the ALJ decided to give Baciewicz's opinion less-than-controlling weight:

> [Baciewicz's] very brief letter of November 30, 2005 is completely conclusory and does not even list diagnoses or medications provided. It does not include any of the claimant's signs or symptoms of her impairments and gives no analysis of how any limitations wold affect her ability to function. In addition, the area of disability per se is also one reserved to the Commissioner. Considering these factors, Dr. Baciewicz's opinions will be considered, but not afforded controlling weight.

(24). The ALJ then discussed Zax's opinion, noting that according to Zax, the effects of any bipolar disorder problem were "on the mild side," and were "only partially consistent with the claimant's allegations." (24). The ALJ stated that, although Zax was not a treating physician, his examination used "accepted diagnostic techniques and clinical practices," and his opinions were "consistent with the record as a whole," and would therefore be "afforded substantial weight." (*Id.*).

At the fifth and last step of the analysis, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform. (25). In that regard, the ALJ found that Plaintiff's non-exertional impairments had no significant effect on the occupational base of unskilled work, and that it was appropriate to apply the grids to reach a conclusion that Plaintiff was not disabled. (*Id.*).

ANALYSIS

As discussed earlier, Plaintiff contends that the ALJ: 1) ignored or selectively evaluated evidence; 2) did not properly apply the treating physician rule; 3) failed to recognize that Plaintiff's substance abuse is related to her bipolar condition; 4) failed to find that Plaintiff had listed impairments; and 5) denied Plaintiff due process at the

18

hearing.

With regard to the claim that the ALJ ignored evidence, Plaintiff states that the ALJ downplayed and mis-characterized her bipolar condition, by referring to it as merely "what the claimant has described as 'bipolar disorder.'" Essentially, Plaintiff argues that the ALJ did not accept that she actually had bipolar disorder. However, the Court disagrees, and finds that the ALJ's statements accurately reflect the statements of Plaintiff's doctors. In that regard, rather than perform any testing or other techniques to determine whether Plaintiff actually had bipolar disorder, her doctors seemed content to accept Plaintiff's statement that she was bipolar. For example, Baciewicz repeatedly referred to "bipolar disorder per Catherine." Accordingly, the ALJ did not mis-characterize the medical evidence concerning bipolar disorder.

Plaintiff further contends that the ALJ failed to acknowledge evidence that she was drug-free for certain periods. Specifically, the ALJ stated: "At the hearing, the claimant stated she had been clean from substance abuse for about 13 months, or since April 2007, but as noted there is no evidence to support this statement." (21). Actually, a report from Strong Recovery dated December 27, 2007, indicates that Plaintiff was "abstinent" since September 2006. (331). Nevertheless, this error by the ALJ does not appear to have had any effect on his decision. Rather, the ALJ found that Plaintiff had only a "history of cocaine dependence and polysubstance abuse." (20).

Plaintiff also alleges that the ALJ failed to consider the side-effects of Plaintiff's medication, and most notably, that Lithium made Plaintiff's hands shake. The ALJ referred to Plaintiff's complaint that "her hands shake as a side effect of Lithium," but stated that "no medication list by treating or non-treating sources includes Lithium

among the claimant's medications." (23). In fact, the record indicates that Plaintiff was prescribed Lithium in July and August of 2005, on a trial basis. (300). However, it appears that this evidence was not before the ALJ, because Plaintiff's attorney did not submit the evidence, until he presented it to the Appeals Council in September 2008. (298). In any event, any error in this regard was harmless, since there is no indication that Plaintiff's shaking hands caused her any significant limitations. For example, Toor observed that Plaintiff's physical exam was essentially normal, and that her "hand and finger dexterity [were] intact. Grip strength 5/5 bilaterally." (186).

Plaintiff also contends that the ALJ failed to discuss evidence concerning Plaintiff's obesity or back pain. However, such was not error, since Plaintiff and her attorney expressly stated that Plaintiff was not claiming to be disabled due to physical ailments. Specifically, at the hearing before the ALJ, Plaintiff's attorney stated, in Plaintiff's presence, that Plaintiff "has a little back trouble that wouldn't prevent her from working. Her primary issues are mental health issues[.]" (365).

For all of the foregoing reasons, the Court finds that the ALJ/Commissioner did not ignore or selectively evaluate evidence.

Next, Plaintiff contends that the ALJ "misunderstood and misevaluated [Plaintiff's] disorders and her substance abuse." (Plaintiff's Memo of Law at 18). For example, Plaintiff alleges that "the ALJ disapproved of Ms. Leisten's substance abuse or dependency," "improperly assumed the role of a health care professional," and "substituted his own judgment or relative expertise against that of the treating health care professionals." (*Id.*). Plaintiff's argument apparently is that the ALJ mistakenly blamed Plaintiff's alleged inability to work on her drug use, as opposed to her mental

illness. (*Id*.). Plaintiff contends that the ALJ should have realized that "substance abuse, denial and poor/risky judgment and sexual practices are part of her bipolar disorder, not the cause of her symptoms." (*Id*.). The Court, though, does not agree that the ALJ based his decision on Plaintiff's drug use, or that his decision was improperly influenced by his "disapproval" of drug abuse. Instead, the ALJ found that Plaintiff has mental impairments, but that such impairments do not prevent her from working. The Court also does not agree that the ALJ improperly substituted his own opinion on medical issues.

Furthermore, Plaintiff contends that the ALJ denied her due process at the hearing, for essentially three reasons: 1) he focused his questions on her history "of illicit substance use"; 2) he used "mostly leading questions;" and 3) the hearing was brief, lasting approximately fourteen minutes. (Plaintiff's Memo of law at 21; Tr. at 364, 376). At the outset, the Court disagrees that the ALJ improperly focused his questions on Plaintiff's drug use. In that regard, the ALJ essentially asked Plaintiff only three questions about that:

Q. And you had a problem with cocaine?

A. Right. Yes.

Q. And are you in a treatment program at the present time?

A. I completed that. I have 13 months clean.

Q. Thirteen months clean?

A. Yes.

(366). Most of the ALJ's questions concerned Plaintiff's medications, her activities of daily living, and the reasons why she felt that she could not work. Moreover, many of

the ALJ's questions were not leading, and those that were leading merely confirmed information that was in the record, such as Plaintiff's age, education level, and job history, and the fact that she had a history of drug abuse. (365-366). Finally, the brevity of hearing did not deprive Plaintiff of due process. After the ALJ finished asking all of his questions, he permitted Plaintiff's attorney to ask whatever questions he had. Additionally, the ALJ agreed to keep the record open, to allow Plaintiff's attorney to submit additional medical records. (365). For all these reasons, the Court finds that the ALJ did not deprive Plaintiff of due process.

Next, Plaintiff maintains that the Commissioner failed to apply the treating physician rule, and specifically, that the ALJ failed "to explain specifically why he did not give controlling weight to Dr. Baciewicz's specialist opinion." (Plaintiff's Memo of Law at 16). Actually, the ALJ explained the reasons that he did not give controlling weight to Baciewicz's opinion. (23-24). Essentially, the ALJ stated that Baciewicz's "very brief letter of November 30, 2005" was conclusory, and failed to list diagnoses, medications, signs or symptoms of impairment, and analysis concerning functional limitations. (24). However, it is well-settled that "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record. In fact, where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (citations and internal quotation marks omitted). In this case, the ALJ should have attempted to supplement the record by obtaining the missing information from Baciewicz. Accordingly, the case must be remanded to allow such development of the record. Such development should include

the nature of Plaintiff's medications and their effect, if any, on her ability t work.

Seeger similarly opined that Plaintiff was incapable of working, although his opinion was rendered after the ALJ's decision.  Additionally, Seeger included diagnoses of "bipolar disorder" and "borderline personality disorder."   As discussed earlier, Plaintiff submitted Seeger's reports to the Appeals Council, but the Appeals Council did not comment on them when it declined to review Plaintiff's case.  On remand, if the ALJ determines that such evidence relates to the relevant period at issue, he should consider the evidence and develop the record further, if necessary.

Finally, upon remand, and after further development of the record, the ALJ should re-visit the five-step sequential analysis in light of the expanded record.

CONCLUSION

For the reasons discussed above, Plaintiff's motion [#12] is granted, Defendant's motion [#11] is denied, and this action is remanded to the Commissioner of Social Security for further administrative proceedings consistent with this Decision and Order, pursuant to 42 U.S.C. § 405(g), sentence four.

So Ordered.

Dated: Rochester, New York
       March 22, 2010
                                      ENTER:


                                      /s/ Charles J. Siragusa
                                      CHARLES J. SIRAGUSA
                                      United States District Judge